IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| DONALD MERRITT MARTIN, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>NANCY A. BERRYHILL, )<br>Acting Commissioner of Social Security, )<br>)<br>Defendant. ) | 1:17CV835 |

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Donald Merritt Martin ("Plaintiff") brought this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for Disability Insurance Benefits ("DIB") under Title II of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.  PROCEDURAL HISTORY

Plaintiff protectively filed his application for DIB on April 8, 2014, alleging a disability onset date of May 22, 2013. (Tr. at 32, 179-85.)[1] His claim was denied initially (Tr. at 85-98, 113-16), and that determination was upheld on reconsideration (Tr. at 99-112, 118-21). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 126.) Plaintiff, along with his attorney, his wife, and an impartial

---

[1] Transcript citations refer to the Administrative Record [Doc. #6].

vocational expert, attended the subsequent hearing on August 3, 2016. (Tr. at 32.) The ALJ ultimately concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 45), and, on July 24, 2017, the Appeals Council denied Plaintiff's request for review of that decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-6).

## II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the] review of [such an administrative] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal brackets omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that in administrative proceedings, "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the

---

[2] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first two steps, and establishes at step three that the impairment "equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations," then "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual function[al] capacity ('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that pursuant to the administrative regulations, the "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

"perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the Commissioner to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

## III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since May 22, 2013, his alleged onset date. Plaintiff therefore met his burden at step one of the sequential evaluation process. At step two, the ALJ further determined that Plaintiff had the following severe impairments:

> residual effects of electrocution (cerebral trauma, burns, hearing loss, and cognitive impairment); osteoarthritis in the right foot; a major depressive disorder; and post-traumatic stress disorder.

(Tr. at 34.) As noted by the ALJ, Plaintiff suffered a work-related electrocution injury in which "[t]he electricity entered his back and exited his left chest and neck area" and "[h]e sustained second and third degree burns to his chest wall, neck and ear." (Tr. at 39). He was hospitalized for several weeks and underwent multiple surgeries through 2015. The ALJ found at step three that none of these impairments, individually or in combination, met or equaled a

5

disability listing. (Tr. at 35-36.) Therefore, the ALJ assessed Plaintiff's RFC and determined that he could perform light work with the following additional limitations:

> [Plaintiff] can sit for six hours in an eight-hour workday and he can stand/walk for a total of six hours in an eight-hour workday. He can lift/carry and push/pull 20 pounds occasionally and 10 pounds frequently. He cannot have any exposure to very loud noise. He can have occasional exposure to loud noise. He cannot have any exposure to unprotected heights, hazardous machinery, or hazardous moving mechanical parts. [Plaintiff's] work is limited to simple, routine and repetitive tasks but not at a production rate pace. He can have occasional interaction with the public. He can have frequent interaction with co-workers and supervisors. [Plaintiff] would be off task no more than 10% of the time in an eight-hour workday, in addition to normal breaks (with normal breaks defined as a 10-15 minute morning and afternoon break and a 30-minute lunch break).

(Tr. at 37.) At step four of the analysis, the ALJ found that the demands of Plaintiff's past relevant work exceeded his RFC. (Tr. at 43.) However, the ALJ further determined at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, he could perform other jobs available in the national economy. (Tr. at 44-45.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 45.)

Plaintiff now raises four challenges to the ALJ's decision. First, he claims that "[t]he ALJ erred by failing to consider adequately the opinion of Dr. Hampton, a treating physician, and by failing altogether to consider Dr. Hampton's opinion that [Plaintiff] was experiencing 'significant subjective distress and disruption of function.'" (Pl.'s Br. [Doc. #9] at 7.) Second, Plaintiff challenges the ALJ's reasons for rejecting the third party testimony of Plaintiff's wife. Third, Plaintiff raises another challenge to the ALJ's handling of the opinion evidence, this time with respect to the opinion of Plaintiff's neuropsychiatrist, Dr. Hoeper. (Id. at 14.) Fourth and finally, Plaintiff contends that "[t]he ALJ erred by disregarding evidence of

[Plaintiff's] severe headaches and by failing to account for them in the RFC and hypothetical question." (Id. at 18.) After a careful review of the record, the Court finds that Plaintiff's contentions merit remand with regard to the handling of the opinion evidence and the consideration of Plaintiff's headaches, for the reasons set out below.

    A.    ALJ's Review of the Opinion Evidence

Plaintiff first challenges the ALJ's assessment of the following opinion rendered by Dr. Edwin Hoeper, an examining neuropsychiatrist, on July 13, 2016. Dr. Hoeper diagnosed Plaintiff with Post Traumatic Stress Disorder and Major Depression, and posited that,

> [b]ecause of [his] PTSD, [Plaintiff] is unable to sustain social relationships, and he is also unable to sustain work relationships. Therefore, I consider him permanently and totally disabled and unemployable.

(Tr. at 603.) In rendering this opinion, Dr. Hoeper noted that Plaintiff has frequent nightmares and anxiety, "especially in public."

> He has intrusive thoughts, is hyper vigilant and cannot tolerate anyone behind him. He does not socialize. His recent memory is severely impaired, so much that he cannot remember what he reads and gets lost when traveling. His working memory is 50% impaired. Anger, sadness and fear come upon him without his understanding why 80% of the time and indicating that his prefrontal cortex is dysfunctional.

(Id.)

The ALJ considered Dr. Hoeper's opinion, and specifically noted that Dr. Hoeper had concluded that Plaintiff "was unable to sustain social or work relationships and that he was permanently and totally disabled." (Tr. at 42-43.) However, the ALJ ultimately found as follows:

> This opinion was based on one-time examination of [Plaintiff]. [Plaintiff's] symptoms, as reported at this examination, were not consistent with the prior treatment records from Dr. Hampton. For example, there was no prior

7

evidence of hypervigilance or intrusive thoughts. Further, the opinion that [Plaintiff] is totally disabled is an issue that is reserved to the Commissioner of the Social Security Administration. Therefore, little weight is given to this opinion.

(Tr. at 43.) Plaintiff now contends that substantial evidence fails to support the ALJ's findings as to Dr. Hoeper. This Court concurs.

As an initial matter, Plaintiff maintains that the weight assigned to Dr. Hoeper's opinion applies only to his finding that Plaintiff is "totally disabled," and that the ALJ failed to address Dr. Hoeper's further opinion that Plaintiff is unable to sustain social or work relationships. (Pl.'s Br. at 17.) The Court agrees that the ALJ's reference to "this opinion" when assigning weight is ambiguous at best. Thus, it is not clear that the ALJ directly addressed Dr. Hoeper's opinion that Plaintiff was unable to sustain social or work relationships.

Moreover, even if the assignment of "little weight" applies more generally, the record fails to support the ALJ's stated reasons for discounting Dr. Hoeper's additional opinions. In particular, the ALJ claimed that Plaintiff's symptoms, on which Dr. Hoeper based his opinion, "were not consistent with the prior treatment records from Dr. Hampton," Plaintiff's treating psychologist. (Tr. at 43.) The ALJ specifically relied on the absence of hypervigilance and intrusive thoughts from Dr. Hampton's notes. However, Dr. Hampton's treatment notes reflect repeated instances of negative ruminations, angry outbursts and "significant subjective distress and disruption of function as a result of his symptoms." (Tr. at 397, 398, 399, 400, 401, 404, 405, 408, 471, 475, 480.) Dr. Hampton assigned Plaintiff a GAF score of 45 in January 2014. (Tr. at 393.) Particularly as to Plaintiff's social difficulties and inability to sustain relationships, Dr. Hampton's treatment notes reflect Plaintiff's social isolation. At his initial

evaluation, Dr. Hampton noted that Plaintiff's symptoms included angry outbursts and limited patience with his family. (Tr. at 392.) In July 2014, Plaintiff reported to Dr. Hampton that he had a hard time being around other people, stating, "'I can smile and be friendly for just a little while but then I start to feel uncomfortable and want to get away.'" (Tr. at 398.) Dr. Hampton's treatment notes continue to reflect Plaintiff's difficulty being around people, including his irritability and restlessness and his angry outbursts. Later treatment notes with Dr. Hampton reveal no further evidence of social interaction outside of Plaintiff's household, and Plaintiff's wife testified that he does not interact with people outside their immediate family due to anger and terrible mood swings. (Tr. 39, 74.) The ALJ noted that according to the testimony, Plaintiff has "anger and mood swings and issues with not wanting to socialize. He has pretty much alienated his mother, sisters, and Mrs. Martin's family." (Tr. at 39, 74.)

With respect to the other evidence of social functioning, the ALJ acknowledged that Plaintiff "does not like to be around others." (Tr. at 36, 38, 42.) However, the ALJ nevertheless found that Plaintiff "has been able to interact appropriately on a daily basis with his wife and son." (Tr. at 42.) Yet even a cursory review of the record belies this statement. Testimony from Plaintiff and his wife as well as Dr. Hampton's treatment notes reflect a volatile relationship between Plaintiff and his son, despite Plaintiff's ongoing attempts to curb his anger. (Tr. at 38-39, 73-77, 398, 400, 401, 402, 404, 475.) Plaintiff's wife testified that they have learned to manage his outbursts, during which he "says horrible things," generally by leaving him alone until he calms down. (Tr. at 39, 75.) Mrs. Martin also reported taking on "more of a role of caretaker than spouse." (Tr. at 39, 77.)

9

The Court also notes that Dr. Hoeper's opinion is consistent with the evaluation by Plaintiff's prior treating neuropsychiatrist, Dr. Gualtieri, who found that Plaintiff was suffering from post-traumatic stress symptoms, depression, and cognitive problems as a result of the electrocution. Dr. Gulatieri noted that Plaintiff's emotional reactions to the event may result in long-term restriction. [4] (Tr. at 331-36.)

Thus, all of this evidence appears to support Dr. Hoeper's opinion, and the ALJ fails to identify any evidence contrary to Dr. Hoeper's opinion that Plaintiff "is unable to sustain social relationships and he is also unable to sustain work relationships."[5] The Court also notes that it appears that the ALJ did not obtain a consultative psychological examination but nevertheless discounted all of the examining mental health professionals, including Dr. Hoeper, Dr. Hampton, and Dr. Gualtieri, based primarily on the unsupported conclusion that Plaintiff "has been able to interact appropriately on a daily basis with his wife and son." (Tr. at 42.) See Woods v. Berryhill, 888 F.3d 686, 695 (4th Cir. 2018.) The record does not

---

[4] The Court notes that Plaintiff also submitted to the Appeals Council treatment notes from Dr. Gualtieri dated September 23, 2016, one month after the date of the ALJ's decision. The Appeals Council did not consider the notes, finding that they did not relate to the period on or before the ALJ's of August 23, 2016. (Tr. at 2.) However, in the treatment note, Dr. Gualtieri states that Plaintiff has been
> disabled since electrocutions in 2012 and 2013. Treated here in 2014-2015 for cognitive, physical and emotional symptoms related to electrocution, which involved brain injury. Subsequently followed up by Dr. Hoepper on Goldsboro. The patient is disabled from work by virtue of pain, cognitive weakness, and posttraumatic stress disorder. Patient was last seen in September 2015 but testing today is unchanged in September 2016.

(Tr. at 14.) This note appears to summarize Plaintiff's treatment and condition prior to August 2016, and further states that testing was unchanged during the year from September 2015 to September 2016, and Plaintiff was still disabled.

[5] To the extent the Commissioner may rely on the one-time nature of Dr. Hoeper's examination, Plaintiff correctly points out that this cannot serve as the sole basis for discrediting Dr. Hoeper's statements, as other one-time examiners, and even non-examining physicians, were assigned significant weight by the ALJ.

support that finding, as discussed above, and in the circumstances substantial evidence fails to support the ALJ's decision.

B.  Headaches

Plaintiff also contends that "[t]he ALJ erred by disregarding evidence of [Plaintiff's] severe headaches and by failing to account for them in the RFC and hypothetical question." (Pl.'s Br. at 18.) At step two, the ALJ acknowledged Plaintiff's testimony that "he has headaches once or twice per week" which "keep him down for one to two days at a time" during which he stays in a dark room. (Tr. at 34-35.) The ALJ also recounted Mrs. Martin's testimony that Plaintiff "has extreme headaches" which last for days along with "swelling on the side of his head where the electricity hit him." (Tr. at 39.) Nevertheless, the ALJ found "no indication in the record of intractable headaches," and, noting Plaintiff's normal EEG results, did not include headaches among Plaintiff's medically determinable impairments. (Tr. at 35.)

Notably, the record in this case contains multiple references to Plaintiff's intractable headaches and swelling, including his frustrations in seeking diagnosis and treatment. (See Tr. at 408) ("[H]e is concerned because he had a headache for a week after our last session and tried to talk with Dr. Gultieri about it but never got a call back"); (Tr. at 473) ("[H]e has had another episode of swelling on the side of his face [but] it has not been diagnosed. He is frustrated that he has not been able to get an authorization to consult with a neurologist about it."); (Tr. at 471) ("[H]e is still concerned about the return of the swelling and headaches."); (Tr. at 472) ("[H]e had a really bad headache with swelling on the side of his head again."); (Tr. at 387) (noting that Plaintiff reports "headache, fatigue, weakness"). An ophthalmologist

11

ruled out an ocular cause for Plaintiff's left-sided headaches and opined that they were "likely migrainous in etiology." (Tr. at 515, 598.) He also recommended that Plaintiff continue following up on this problem with his primary care physician, particularly given the electrocution damage sustained by that side of Plaintiff's head. (Id.)[6]

Significantly, no physician opined that Plaintiff was not experiencing headaches or that his headaches and the symptoms and limitations therefrom were less severe than alleged. The only evidence relied upon by the ALJ was Plaintiff's normal EEG. This test, which records electric signals in the brain, was used to rule out Plaintiff's suspected seizure activity. (See Tr. at 407-08.) An EEG is not used to diagnose headaches or, in most cases, their cause. Accordingly, the ALJ presented no valid reason for omitting Plaintiff's headaches as a severe impairment at step two of the sequential analysis. He then compounded this error by rejecting, without basis or analysis, evidence that Plaintiff's headaches cause additional functional restrictions, including missing multiple days of work per month. This error presents an additional basis for remand.[7]

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be REVERSED, and that the matter be REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g). The Commissioner should be directed to remand the matter to the ALJ for proceedings consistent with this Recommendation. To this extent, Defendant's Motion for Judgment on the Pleadings [Doc. #11] should be DENIED, and

---

[6] Plaintiff's hospital records reflect his complaints of headache following the electrocution. (Tr. 284.) In addition, a CT scan at the time of Plaintiff's electrocution also noted "severe multilevel degenerative disk disease within the cervical spine, with ankylosis of the C4 and C5 vertebral bodies" (Tr. at 317), but that finding was not addressed by the ALJ.

[7] Having reached this conclusion, the Court need not consider the remaining issues raised by Plaintiff.

Plaintiff's Motion for Judgment on the Pleadings [Doc. #8] should be GRANTED. However, to the extent that Plaintiff's motion seeks an immediate award of benefits, it should be DENIED.

This, the 26th day of July, 2018.

/s/ Joi Elizabeth Peake
United States Magistrate Judge